Filed 1/28/16  P. v. Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D065801 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS250943) |
| MARIO A. LOPEZ, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed.


Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

At all pertinent times, defendant and appellant Mario A. Lopez was a prison

inmate. In July 2011, Lopez discovered that a fellow inmate, 70-year-old Russell

Hartsaw, was a child molester, and Lopez, along with other inmates, brutally murdered

Hartsaw. Lopez was convicted of first degree murder and torture. Among other evidence

of Lopez's guilt, at trial the prosecution presented two notes which Lopez wrote to other

prisoners after the murder and a letter he wrote to another inmate's wife, all of which

implicated Lopez in the murder.

Although prior to trial the trial court excluded gang-related evidence, during trial

two witnesses made oblique references to Lopez's gang affiliation. On appeal, Lopez

argues that in light of those references the trial court erred in failing to grant his motions

for a mistrial. We find no abuse of discretion. We also find the trial court properly

permitted witnesses to make reference to Lopez's prison moniker—"Evil"—because it

assisted in identifying defendant as one of the perpetrators of the murder. Contrary to

Lopez's argument, there was sufficient evidence to support his convictions of first degree

murder and torture. Finally, we reject Lopez's contention the trial court failed to properly

instruct the jury on first degree murder while lying in wait within the meaning of Penal

Code[1] section 189.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2011, Lopez was a prisoner being detained at the George Bailey Detention

Center and was known in the prison by the moniker "Evil." Prison personnel had made

Lopez the "captain" of the medical unit where he was being held, and inmates in the unit

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

followed his orders without question.

Hartsaw was also a prisoner at Bailey, and, on the evening July 17, 2011, Hartsaw asked a correctional officer to be moved from his then current unit to another unit. Later that evening, a correctional officer placed Hartsaw in the medical unit and asked Lopez to help Hartsaw find a bunk. Lopez agreed. At some point, Lopez learned that Hartsaw had been in protective custody and that he was a convicted child molester.

A few hours after Hartsaw was placed in the unit, Lopez and a number of other inmates lured Hartsaw to an isolated area of the unit, and, shortly after guards had passed through the area, Lopez and the other inmates spent 30 minutes punching, kicking, and stomping Hartsaw to death. Toward the end of the assault, Lopez circled Hartsaw and repeatedly jumped on his genitals, limbs, and torso, causing Hartsaw's body to bounce "like a trampoline."

After the beating was over, and at Lopez's instruction, other inmates dragged Hartsaw back to the floor near his bunk and placed his body in a position so that it appeared as if Hartsaw had fallen from his top bunk. Lopez also instructed the other inmates to clean up the area where the beating had occurred; while they were doing so, Lopez took a shower and sang "loudly and happily."

Approximately 20 minutes after the beating was over, an inmate alerted guards that Hartsaw "was down." Emergency personnel who responded were unable to resuscitate Hartsaw. A medical examination disclosed Hartsaw had suffered 18 rib fractures, 32 facial injuries, multiple facial fractures, two skull fractures, a fractured

3

sternum, numerous internal injuries and bleeding.

Following Hartsaw's death, Lopez sent two notes or, in prison parlance, kites, to other inmates. One kite stated Lopez had already given 25 years of his life to the state, and it looked like the state might get the rest because Lopez was now facing murder charges. The kite stated: "That fool was also a P.C.," which was a reference to the fact Hartsaw was in protective custody and therefore presumably a child molester. According to Lopez's kite, Hartsaw showed Lopez paperwork which established that Hartsaw had been convicted of child molestation. The kite further stated Lopez "took care of a fuck'n chomo [child molester] that ain't gon hurt kids no more." A second kite set forth Lopez's hatred of child molesters and stated that many "who no do got respeto what I did." The kites were signed "Evil."

Lopez also sent a codefendant's girlfriend a letter in which he stated that he was sure her boyfriend told her what had happened and "let's just say 'them people' aren't allowed, sabes?"

Lopez and four other inmates were charged with first degree murder, conspiracy to commit murder and torture. (§§ 187, subd. (a), 182, subd. (a)(1) & 206.) Prior to trial, three of the other defendants pled to lesser chargers. At trial, Lopez was convicted of first degree murder and torture; however, the jury found him not guilty of conspiracy. The jury was unable to determine whether Lopez's codefendant was guilty of murder, but it did find him not guilty of torture; later, the codefendant pled guilty to involuntary manslaughter.

4

Following the trial, Lopez moved for a new trial and the trial court denied his motion. Lopez admitted prior prison allegations and was sentenced to a term of 28 years to life.

## DISCUSSION

### I

A. Gang Evidence

As we indicated at the outset, because no gang allegations were made against Lopez, prior to trial the trial court excluded the presentation of evidence of Lopez's affiliation with any gang. Nonetheless, during trial, in explaining why "Evil" was in charge of other prisoners, a prosecution witness, Omar Acosta, made a reference to a gang known as South Siders; later, Acosta stated Lopez was the leader of the South Siders, and the attack on Hartsaw was performed by South Siders. During a break in Acosta's testimony, the trial court instructed the prosecutor to refrain from using the term "South Siders" in questioning witnesses because it might prompt a response that included gang references. The trial court also denied Lopez's motion for a mistrial, finding that Acosta's references to gangs was accidental and that the lay jury would not draw references that might be drawn by those familiar with gang culture.

Later, counsel for Lopez's codefendant cross-examined Acosta about a prior incident in which Lopez had a conflict with another prisoner who was in a bible study group with Acosta. Acosta stated that Lopez "dealt with him." The trial court prevented Acosta from offering any further testimony on the subject because it found that the

5

evidence would be barred as prior bad act. (Evid. Code, § 1101, subd. (b).) In light of the reference, Lopez's counsel made another motion for a mistrial, which the trial court denied.

A district attorney's investigator also made reference to gangs in explaining the import of a reference to "Surenos," which appeared in the letter Lopez sent to his codefendant's girlfriend. Lopez's counsel made a third motion for a mistrial, which the trial court also denied.

B. Standard of Review

As we indicated, on appeal Lopez argues this evidence denied him a fair trial and the trial court erred in denying his motions for a mistrial.

" 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) Thus, a trial court's ruling on a motion for a mistrial "will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.)

C. Analysis

Here, a host of circumstances put the trial court's rulings on Lopez's motions for

6

mistrial well beyond our power to disturb them. First, there was overwhelming evidence Lopez participated in and indeed instigated Hartsaw's horrific murder and was able to do so because of his role as a leader of the Hispanic inmates in his unit. Significantly, the evidence of his leadership role in the unit was presented apart from any gang affiliation. More damning of course were the kites and letters Lopez sent implicating himself in the murder. Second, as the Attorney General points out, of necessity the jury knew the murder occurred in a state prison and that both the murderers and the victim were felons. Third, Lopez demonstrated the most profound callousness by singing in the shower immediately after the lethal beating and by taking pride in the kites and letter in what had happened. The overwhelming evidence of guilt, the location of the crime, and the pride and joy Lopez took in his role in the murder, were not only admissible and probative, but together those circumstances were far more prejudicial than the relatively oblique and benign references to criminal street gangs. Thus, on this record, the trial court in no sense abused its discretion in denying Lopez's motions for a mistrial.

II

Next, Lopez contends the trial court erred in permitting prosecution witnesses to refer to his prison moniker, Evil. We find no abuse of discretion.

A. In Limine Ruling and Trial References

Prior to trial, Lopez moved for an order preventing both the prosecution and his codefendant from making any reference to his prison moniker on the grounds it was unduly prejudicial. In opposing the motion, the prosecution argued that references to the

7

moniker were necessary to identify Lopez, and the codefendant argued that the moniker was relevant to his defense of duress. The trial court, in part, granted Lopez's motion. The court ordered that neither the prosecutor nor any law enforcement or government witness called by the prosecution make any reference to the moniker; however, the court permitted inmate witnesses, Lopez's codefendant and codefendant's counsel to refer to Lopez by his moniker. In making its ruling, the trial court noted that although the prosecutor could easily control the witnesses employed by the government and require that they refer to him as Mr. Lopez, there were practical problems sanitizing the identification of other inmates who may have only known Lopez as Evil. The trial court stated: "I can't save Mr. Lopez from himself. He uses the term. He goes by that term. I'm sure if I saw his tattoos in that picture, I'm sure somewhere that says 'Evil' on them. So that's the persona he has given to these witnesses. And I understand sanitizing, but I can't erase things completely."

B. Legal Principles

"Evidence is relevant if it tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " (*People v. Williams* (2008) 43 Cal.4th 584, 633; see Evid. Code, § 210.) "Even if relevant, evidence may be excluded in the trial court's discretion 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) Rulings regarding relevancy and Evidence

8

Code section 352 are reviewed under an abuse of discretion standard.  [Citations.]"

(*People v. Lee* (2011) 51 Cal.4th 620, 643 (*Lee*).)

In *Lee*, the defendant shot his victim seven times in the face because she was unwilling to have sex with him; the defendant used the moniker "Point Blank."  In finding that the moniker was relevant, the court stated:  "[E]vidence of defendant's nickname was relevant and extremely probative with regard to the intent with which defendant shot [the victim] and whether the killing was premeditated and deliberate.  The prosecution's theory was that defendant shot [the victim] the way he did, with seven shots to her face at close range, to live up to his nickname.  In that regard, in her closing argument, the prosecutor reminded the jury that, immediately after the murder, defendant did not respond when [a witness] asked, 'So, is that why they call you Point Blank?'  The prosecutor also reminded the jury that defendant sang a gloating rap song about the shooting and said,  ' "They're never gonna really have to make a rap about my name being Point Blank." '  The next words of the prosecutor's argument to the jury were, 'Does that show his express intent to kill?  Absolutely.  Absolutely.' " (*Lee*, *supra*, 51 Cal.4th at p. 643, fn. omitted.)

In rejecting the defendant's contention the moniker was unduly prejudicial, the court stated:  "[T]he trial court did not abuse its discretion by finding the risk that the jury would improperly infer criminal disposition from defendant's nickname did not substantially outweigh the fact that evidence of defendant's nickname was highly probative because it uniquely tended to prove defendant had a specific reason for

9

shooting [the victim] multiple times at very close range. We note that, in order to minimize the prejudicial impact of the evidence, the prosecutor avoided any reference to the subject of gangs throughout the trial by reminding the court to instruct witnesses not to mention defendant's gang affiliation, and, at defendant's request, the jury was instructed not to consider the evidence of defendant's nickname 'to prove that defendant is a person of bad character, has a disposition to commit crimes, or has ever acted in a manner consistent with this nickname.' " (*Lee*, *supra*, 51 Cal.4th at p. 644, fn. omitted.)

C. Analysis

Here, Lopez's moniker was plainly relevant in establishing his identity as the author of the two kites and letter. The other inmates' repeated references to the moniker helped show that, consistent with the identity he had established in prison, Lopez was the author of the kites and letter and his use of it was in no sense unusual or out of character. The moniker was also relevant with respect to the allegation that Lopez was guilty of torture. As in *Lee*, there was a logical connection between the moniker and the intent element of the torture allegation. Thus, the moniker was relevant under Evidence Code section 210.

The trial court did not abuse its discretion in finding that the inmates' references to the moniker and its presentation in the kites and letter were not unduly prejudicial under Evidence Code section 352. The trial court limited undue prejudice by preventing government witnesses and the prosecution from making reference to it, thereby reducing the likelihood the moniker would connect Lopez with a gang or be treated as evidence of

10

bad character, rather than as proof of identity and intent. As presented to the jury by other inmates, the moniker suggested very little more than Lopez's identity as the author of the kites and letter and his intent with respect to the torture charge. The real prejudice Lopez suffered was the proper connection the moniker made between Lopez and the incriminating and callous statements set forth in the correspondence.

In sum, in permitting reference to Lopez's moniker the trial court did not abuse its discretion.

III

The jury was presented with four alternative theories of first degree murder: (1) willful, deliberate, and premeditated murder; (2) murder by torture; (3) murder by lying in wait; and (4) murder while committing the felony of torture. The jury was also instructed on the substantive offense of torture. On appeal, Lopez argues there was insufficient evidence that Lopez intended to inflict torture on Hartsaw.

Because there were other theories of first degree murder that, by implication, Lopez concedes were amply supported by the record, Lopez's argument, even if it had merit, would not impact his murder conviction. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129-1131.) We presume that when alternative theories of guilt are presented to a jury, the jury will only adopt the theory or theories for which there is substantial evidence. (*Ibid*.) In any event however, there was sufficient of evidence of torture to support both a murder by torture conviction as well as a torture conviction.

11

A. Legal Principles

The substantive crime of torture requires proof: "(1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223; see § 206.) First degree murder by torture occurs when a defendant commits " 'acts causing death that involve a high degree of probability of the victim's death' " and did do so with " 'a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643; see § 189.) Importantly, a jury "may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. [Citation.]" (*People v. Streeter* (2012) 54 Cal.4th 205, 237.)

B. Analysis

At trial, the prosecution presented evidence that the beating Hartsaw endured was approximately 30 minutes long and that, after an initial beating, Lopez circled Hartsaw and jumped on his limbs, torso, head and genitals. Hartsaw suffered gruesome and extensive injuries over his entire body. As we have noted, shortly after the beating was concluded, Lopez took a shower and sang loudly and happily. We also note that the kites and letter Lopez wrote after the murder manifested considerable antipathy toward pedophiles, such as Hartsaw. Contrary to Lopez's argument, this evidence was more than

12

sufficient to establish both the substantive crime of torture and murder by torture. In particular, the manner in which Lopez stomped on Hartsaw's genitals and, following the beating, gleefully took a shower, was more than sufficient evidence of an intent to severely injure Hartsaw and with a sadistic purpose within the meaning of both sections 206 and 189.

IV

Finally, Lopez contends the trial court should have sua sponte instructed the jury that in order to find him guilty of first degree murder under a lying-in-wait theory, the jury needed to find that Lopez acted with an intent to kill or to cause injury likely to cause death. We find no such sua sponte duty.

A. Lying in Wait Instruction

The trial court provided the jury with a version of CALCRIM No. 521, which stated: "The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if:

"1. He concealed his purpose from the person killed;

"2. He waited and watched for an opportunity to act;

"AND

"3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but

its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. Deliberation means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act. An act is done with premeditation if the decision to commit the act is made before the act is done.

"A person can conceal his purpose even if the person killed is aware of the person's physical presence.

"The concealment can be accomplished by ambush or some other secret plan."

B. Legal Principles

Section 189 provides that a murder which is perpetrated by means of lying in wait is murder of the first degree. In rejecting the argument that Lopez now advances, the court in *People v. Laws* (1993) 12 Cal.App.4th 786 stated: "[N]othing in section 189 requires the lying in wait to have been done with the intent to kill. Likewise, nothing in the statute requires the lying in wait to have been done with the intent to injure. (Cf. [*People v.*] *Thomas* [(1953)] 41 Cal.2d [470,] 474 ['where a murder is shown to have been committed by "lying in wait" a showing of intent is unnecessary to fix the degree'].) To impose such a requirement would, in effect, add an additional element to the crime of first degree murder when the murder perpetrated by lying in wait is committed with implied malice. It would require that the killing result from an intentional act, the natural consequences of which are dangerous to human life, deliberately performed with knowledge of the danger to, and with conscious disregard for, human life *and* performed with the intent to kill or injure. We have no authority to add such an element; imposition

14

of a requirement of independent proof of intent to kill or injure 'would be a matter for legislative consideration.' [Citation.] [¶] All that is required of lying in wait is that the perpetrator exhibit a state of mind equivalent to, but not identical to, premeditation and deliberation. [Citation.] This state of mind simply is the intent to watch and wait for the purpose of gaining advantage and taking the victim unawares in order to facilitate the act which constitutes murder. [Citation.] It does not include the intent to kill or injure the victim. [Citations.]" (*Id.* at pp. 794-795, fn. omitted.)

Contrary to Lopez's argument, nothing in *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1148-1149 (*Gutierrez*) altered the basic principle that in adopting section 189 the Legislature determined that lying in wait, by itself, is the functional equivalent of premeditation, deliberation and intent, and that no additional proof of an intent to kill or injure is required in order to find a defendant guilty of first degree murder. (See *Id.* at p. 1149, fn. 10.) The court in *Gutierrez* did find and hold that in order to prove the *special circumstance* of lying in wait, the prosecution must establish that the killing was intentional and that the murder occurred *during* a period of concealment and watchful waiting. (*Id.* at p. 1149.) That holding has no bearing here, where no special circumstance was pled or proved.

DISPOSITION

Having found no error,[2] the judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.

---

[2] Because no error appears in the record, we also reject Lopez's claim of prejudice from cumulative error.